## HEARD APRIL TERM, 1878.

## RAILROAD COMPANY *vs.* WHITE.

Where the charter of a corporation expresses the conditions upon which it is granted, it is not competent to add other conditions supposed to arise by implication.

In an action against A to recover the sum subscribed by him to the capital stock of a corporation, testimony that A was appointed to receive subscriptions to the stock at a meeting of the corporators, that he had assumed to act under such authority, and had taken not only his own but also the subscriptions of others, was competent to go to the jury for the purpose of shewing that he was bound by his subscription, he having afterwards erased his name from the paper before he turned it over to the company.

BEFORE KERSHAW, J., AT CHESTER, OCTOBER TERM, 1877.

Action by the Cheraw and Chester Railroad Company against R. I. White to recover a sum of money alleged to have been subscribed by the defendant to the capital stock of the company.

The defendant by his answer admitted that he had signed a paper by which he subscribed $1,000 to said capital stock, but alleged that the paper subscribed by him was at the time in his possession and under his sole control; that he had not been legally appointed

by a majority of the stockholders a commissioner or agent to receive subscriptions, and that before the paper left his possession and had been turned over by him to the company he had determined not to become a subscriber and had erased his name from the paper.

The following is the testimony given at the trial:

William H. Hardin testified: I am President of the Cheraw and Chester Railroad Company; Erwin, Barber, Stevens and others Directors. [The paper writing, the subject of the action, shown him.] I recognize this paper, having the following form:

### *Cheraw and Chester Railroad.*

We, the undersigned, severally subscribe for the number of shares of the capital stock of the Cheraw and Chester Railroad Company opposite our respective names, and severally agree and promise to pay for the same at the par rate of fifty dollars per share, to the Treasurer of the said company, at such times and in such installments as the same may hereafter be called for.

| Name. | Shares. | Amounts. | Remarks. |
| --- | --- | --- | --- |

It was turned over to me as assets of the company in January, 1877. The first signature is that of R. I. White, defendant, for $1,000. There are other signatures for various amounts. There were other papers of the same sort sent out for the same purpose. It will require all the stock subscribed, and more, to build the road and pay the debts. Debts were contracted on faith of this subscription in part. Three of the subscribers to this paper have paid.

*Cross-examined:* There is an attempt at cancellation of defendant's name on this paper. Three of the names are scratched. The paper is now in same condition as when I received it, except the three who have paid are marked "*pd.*" All the subscriptions for stock are in this form. Thad. McFadden, one of the subscribers to this paper, paid $100 by note last March, with interest, he thinks. McFadden's name is scratched. The condition to all the names, except defendant's, is as follows: "If I am taxed, I do not pay this subscription." No condition to defendant's name. All the subscribers, except Anderson, owned property for taxation. J. G. Hall

and James Wilson, Sr., gave each his note for amount subscribed two or three weeks ago. Note for $100, without interest. Chester County subscribed to the stock of the Chester and Lenoir Railroad in 1873 or 1874, and in July, 1874, subscribed $75,000 to Cheraw and Chester Railroad Company. Subscription to Chester and Lenoir Road was first made, but not a year before the last. County has levied taxes to pay their subscription. The first levy for C. & C. R. R. was in 1875. I was in Lancaster on 15th April, 1873, when the chartered corporators of C. & C. R. R. met. A majority of the corporators were present. S. Jackson, W. A. Evans, John B. Erwin, Wm. Stevens, W. A. Moore, John R. Walsh, A. H. Davega, T. H. Moffatt and W. B. McMillan were present in person, and F. A. Cahew, Henry McIver, H. Craig and George W. Melton by proxy; others absent. No stock was represented. The corporators appointed the following persons, sixty-one in all, to receive subscriptions to the road : * * * * * Cedar Shoals, Chester County, R. I. White; and elected J. A. Haseltine President and E. F. Malloy, W. A. Evans, John S. Millen, W. A. Moore, John B. Erwin, Wm. Stevens, T. H. Moffatt, John S. Wilson and Dr. A. H. Davega Directors. White was not present at this meeting. This organization was re-elected annually. Next meeting of these Directors was on 28th May, 1873. The first meeting of stockholders was on 1st September, 1874, when 2,106 shares of stock, being a majority thereof, was represented in person or by proxy. Next meeting of stockholders was on 27th June, 1876; 1,141 shares represented; can't say it was a majority. This was a call meeting. The next regular meeting of stockholders was on 1st August, 1876. It was an annual meeting, and 1,980 shares of stock, being a majority thereof, were represented. Same officers elected. The next meeting was on 23d January, 1877, when 1,704 shares were represented. At this meeting I was elected a Director, and on 1st February, 1877, elected President of the company. Haseltine had been President up to this date. On 1st August, 1877, the stockholders again met; 1,699 shares represented, which was a majority of the stock. This the last meeting.

*In reply :* The written conditions annexed to the paper are in handwriting of defendant.

John S. Wilson : I was at the first meeting of corporators, on 15th April, 1873, and was then elected a Director. Subscription papers were afterwards sent to me and sent out to the Commission-

ers; one was sent to the defendant. On the day they were received, I sent them out, sent them to Whitesides, with request to send them to White and others. Defendant told me lately that I had said I would send him a paper for subscriptions; I don't remember the original conversation. White asked me if he had not sent the paper back to me; said he sent it by mail.

*Cross-examined:* I was not a corporator 15th April, 1873. I sent the paper through Whitesides, in a separate envelope, addressed to White. I saw the paper in its present shape first on 28th September, 1877. White's name then canceled as now.

*In reply:* Defendant, in conversation alluded to, was trying to call to my mind that he returned paper to me as principal Director here. I saw in 1874 all the papers presented by the Treasurer to a committee to estimate amount of stock. This paper in suit was not among them.

J. A. Haseltine: I was the first President. I saw the paper, subject of this action, for the first time in September or Fall of 1874, twelve or eighteen months after the company was organized, and have had it ever since. It came to me by mail; no letter with it. Dunlap said he had subscribed to defendant's paper without any conditions, and he intended to pay it, and he had authorized no condition put to it. [This declaration of Dunlap's objected to, but admitted; defendants excepted.]

*Cross examined:* The paper, in 1874, was in same condition as now, except the three marked "*pd.*" Conversation with Dunlap was several months before the paper was received; no one present but Dunlap.

*In reply:* Defendant said to me in Baltimore, two or three years ago, after I got the paper, that he would give $1,000 if road would run by his house.

W. D. Ingram: First saw the paper in action in defendant's hands; defendant's name only on it then, and was not scratched. Defendant asked me to subscribe in early part of the Spring, two, three or more years ago. Nothing was said about conditions or taxes.

*Cross-examined:* I readily refused to subscribe. Dunlap said there were no conditions at first, but he had it put there after he heard he was to be taxed; said he authorized White some time afterwards to put in this condition.

*In reply :* Dunlap first said there were no conditions; afterwards said conditions were authorized to be put to his subscription. White mentioned no other business, and was the only visit he has made to me.

Jesse C. Clifton : Recognizes the paper, the subject of this action. The paper had four signatures when I first saw it; not scratched; no conditions to it. I was in the field, planting cotton, when the defendant came; asked me to subscribe, and mentioned no conditions; said it would be in installments and easily paid. He seemed anxious. Names to papers were defendant's, Dunlap's, Terrell, and down to McFadden. White was there half hour; does not visit often, and attends closely to business.

*Cross-examined :* I gave defendant no reason to think I would subscribe, and would not have subscribed on conditions.

*In reply :* I was not able to subscribe.

Uriah Jordan : White brought the paper to me in plantation ; some names on it. I did not intend to subscribe, and told defendant so very soon. Defendant does not often visit me.

J. G. Clifton : Defendant presented the paper to me. . James Wilson's name was there, and all above it. There were no conditions annexed and no scratched names; no conditions were mentioned. This in Spring of the year.

*Cross-examined :* I did not refuse to subscribe right there.

*In reply :* This after considerable conversation.

Thad. McFadden : I was in business with defendant as merchants. I have seen the paper; I signed it. There were no conditions and no names scratched; I scratched my name first; I intended to move away, and canceled my name. We dissolved in August, 1874. I remained with Mr. White until October, 1874. I then went to Lancaster, but am now living in Chester. White's name not scratched when I signed, and heard first of conditions after I signed, or about the time the tax was levied for Chester and Lenoir on this road. I then put in the condition; don't know how long after I signed. I reckon it was after I signed I first heard of conditions. I then understood that, if taxed, subscription was void ; how long after, don't know.

*Cross examined :* I was present when White received the paper by mail; there was no letter with it. I did not understand defendant was agent of railroad. Defendant signed a day or two before I did. Heard defendant telling parties signing that they could

annex any conditions before he handed it in. I am not able to say whether the talk about conditions was before or after I signed. Conditions opposite my name when I canceled. I either put the conditions in or authorized White to do so; but I think it is in my handwriting. I thought I had a right to cancel my name. Dunlap is a taxpayer in Chester County. Owning property on the road prompted me to give my note last Spring for $100; gave note for $100, interest from date. Defendant had the paper when he scratched his name. The paper was sent up before October, 1874. The County subscription was talked of, but can't say whether before or after I signed.

*In reply:* Four names before mine. Some of the conditions put in about the time we dissolved.

J. A. Haseltine recalled: No authority given to any of Commissioners to receive conditional subscriptions. They were appointed by the corporators. Nothing said about conditions on the minutes.

B. J. Witherspoon [Record of proceedings of corporators, Directors and stockholders offered in evidence]: I was Secretary. On 28th of May, 1873, direction resolved that no conditional subscriptions be received. At this meeting a call of five per cent. on subscriptions was made. At meeting of directory 1st September, 1874, calls were made as stated in complaint, and notices thereof published in the Chester Reporter on the 15th of October, 1874, and subsequently. People generally prompt in paying. Defendant never paid his. I was Treasurer of the company till February, 1877.

*Cross-examined:* First saw this paper in Haseltine's hands, then in same condition as now, except "*pds.*" None of the parties to this paper paid anything or attended the meetings of the stockholders that I know of.

Thad. McFadden recalled: Cedar Shoals postoffice was at White's store. We were subscribers for the Chester Reporter for part of the time I was there. The Reporter came to the office for others. Defendant and McFadden were postmasters there.

*Cross-examined:* I never attended a meeting of the stockholders.

John Buchanan: I am editor of the Chester Reporter. Defendant has been a subscriber to the Reporter since the 2d of July, 1874. White and McFadden were subscribers in 1873, at Cedar Shoals postoffice.

Columbia, April, 1878.

The Chester Reporter of the 15th of May, 1873, offered, containing an advertisement that books of subscription to the Cheraw and Chester Railroad Company would be open till the 20th of May, when they would be closed. R. I. White was named in the advertisement as the Commissioner for Cedar Shoals, with other persons for other places.

From the records of meetings in evidence, it appears that the chartered corporators held their second meeting on the 17th of September, 1873, in pursuance of a call by the Board of Directors of said road—seven present in person and five by proxy. After locating the road, the corporators adjourned *sine die.*

Also, on the 1st of August, 1874, the President and Directors, as successors of the corporators of the Cheraw and Chester Railroad Company, by resolution, turned over the road to the stockholders of said road, on condition that said stockholders, as their successors, elect ten Directors immediately, each share of stock entitling the holder to one vote, and the said Board then adjourned *sine die.* The stockholders then took charge of the road and elected the Board of ten Directors.

The plaintiff here rested, and the defendant moved for a nonsuit on the grounds:

1. Because the plaintiff has failed to prove itself a body corporate under and by virtue of and pursuant to an Act of the General Assembly of this State entitled "An Act to charter the Cheraw and Chester Railroad Company," approved February 27th, 1873, as alleged in the complaint, so as to enable plaintiff to bring this action for calls on subscriptions to stock, inasmuch as it had failed to prove that the $1,000,000 of stock required by the charter had been in fact subscribed.

2. Because plaintiff has failed to prove any valid contract between plaintiff and defendant, inasmuch as defendant had not been appointed Commissioner to make contracts for the company with subscribers by a majority of the chartered corporators as required by law.

The Court refused the motion for nonsuit and defendant excepted. The case was then submitted to a jury, who found for the plaintiff. The defendant appealed.

*Patterson & Gaston,* for appellant.

*Hemphill, Rion,* contra.
VOL. x—11

July 31, 1878. The opinion of the Court was delivered by

WILLARD, C. J. The only questions brought before us by the present appeal arise on the exceptions to the refusal of the Circuit Judge to nonsuit the plaintiff. The action was upon a subscription to the capital stock of the plaintiff corporation alleged to have been made by the defendant while acting as an agent of the plaintiff corporation in procuring subscriptions to the capital stock of said corporation. The first ground of nonsuit raises the question whether the plaintiff was competent to sue as a body politic and corporate in pursuance of its Act of incorporation. The objection cited to its competency is, that it had failed to prove that the $1,000,000 of stock provided by its charter had been in fact subscribed.

The Act of incorporation (15 Stat., 442,) does not express any such limitation or condition, as it regards the grant of corporate authority to the incorporators. If such a limitation exists, it must be made out by implication, having regard to the objects of the Act of incorporation. The difficulty in the way of raising such implication lies in the fact that the Act expresses the conditions attached to the grant of the corporate franchise in the following language: "*Provided*, That said persons shall commence operations upon said road within two years after the passage of this Act and complete the same within five years." This proviso is immediately connected with the words conferring the franchise, as a proviso thereto, and makes the intention to subject the words of grant to it as a condition entirely clear.

The Legislature having thus expressed the conditions on which the grant of the franchise should depend, it is not competent to raise other and additional conditions by mere implication. It is not pretended that there is ground for a necessary implication, arising from the fact that any of the expressions of the Act would be insensible, or any of its provisions ineffectual, unless such intent was raised; but the attempt to raise the implication rests on no higher ground than that it is a reasonable inference considering the nature and the objects of the grant. Considered in this light the answer is conclusive that the conditions of the grant being expressed they are not left to inference. Section 6 of the Act fixes the period of commencement at three years instead of two, as fixed in Section 1. But it is not necessary to construe these Sections as connected together, as no objection is made based upon a failure to commence

operations within the time limited by law. The first ground of nonsuit was not well taken.

The proposition advanced by the second ground for nonsuit is based on the fact that the subscription list was in the hands of the defendant for the purpose of his obtaining subscriptions thereto in behalf of the corporation at the time the defendant signed it as a subscriber, and claims that no contract could arise as between the plaintiff corporation and defendant, unless it is made to appear by proof that the defendant had been appointed Commissioner to make contracts of that nature for the company by a majority of the chartered corporators. There was direct evidence that the defendant, White, was appointed to receive subscriptions to the road at a meeting of the corporators at which a majority of the corporators were present. Evidence was also introduced to the effect that the defendant assumed to exercise such authority in behalf of the company and actually took the subscriptions of several persons in addition to subscribing the subscription list himself.

These proofs were competent to go to the jury upon the question whether the defendant was acting in behalf of the plaintiff corporation while holding the subscription list and soliciting and obtaining subscriptions. The Act does not require the appointment of commissioners for such purpose, but its language in regard to the persons authorized to take subscriptions is as follows : "Under the direction of such persons as may be determined on by a majority of said incorporators." The Circuit Judge would not have been justified in withdrawing such evidence from the jury. The second ground on which a nonsuit was asked was insufficient.

The appellant has pressed other reasons for demanding a nonsuit than those that appear to have been urged at the trial and cannot be considered for that reason. It is not competent to reverse a ruling at the Circuit on grounds that were not urged before the Circuit Court.

The appeal must be dismissed.

*McIver*, A. J., and *Haskell*, A. J., concurred.